# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**GARY COLOREZ,**

      **Plaintiff,**

    **v.**                    **Case No. 1:17–cv–737**
                                    **JUDGE DOUGLAS R. COLE**

**CITY OF CINCINNATI,**
***et al.,***

      **Defendants.**

## OPINION AND ORDER

In this action, Gary Colorez, a public employee, claims he was terminated in retaliation for exercising his First Amendment rights. Now before this Court is a Motion for Summary Judgment (Doc. 21) by the three defendants—the City of Cincinnati and two of its employees, Maraskeshia Smith and Harry Black (the "City Defendants"). The Court heard oral argument on January 22, 2020. For the following reasons, the Court **GRANTS** the Defendants' Motion and **DISMISSES WITH PREJUDICE** the remaining claim against the City Defendants.

## FACTUAL BACKGROUND

### A. Colorez Begins Employment with the City of Cincinnati.

The City of Cincinnati (the "City") hired Plaintiff Gary P. Colorez ("Colorez") on June 18, 2017, as the Superintendent of the Neighborhood Operations Division ("NOD Superintendent"), which is part of the City's Public Services Department, commonly called "Sanitation." (Defs.' Proposed Undisputed Facts ("Defs.' Prop.

Facts"), ¶ 1, Doc. 21-1, #441[1]). Colorez's job duties required him to manage City functions, including sanitation, greenspace, trash collection, and lot abatement. (*Id.* at ¶ 7). Colorez understood his "job was to make sure [trash collection and greenspace maintenance] was done efficiently." (*Id.*). While employed, Colorez reported directly to Joel Koopman ("Koopman"), the Deputy Director of Public Services, who in turn reported to Defendant Maraskeshia Smith ("Smith"), the Director of Public Services. (Colorez Dep., 15–16, Doc. 20, #224–25). Smith reported to the other individual Defendant, then-City Manager Harry Black ("Black").

Colorez's official job description and responsibilities were detailed in the position's Class Specification (a form of job description for City jobs). (Colorez Dep. Ex. 2, Doc. 20-2, #379–83). Colorez maintains he did not see this job description before being hired, and disputes whether some of the functions set forth in that description were in fact part of his job. (Colorez Dep. at 33–35, #242–44). During his deposition, though, he admitted to exercising many of the listed duties, including oversight, professional development, labor, contract interpretation, and payroll as it related to his department. (*See id.* at 33–37, #242–46). Colorez stated he "was supposed to work closely with the director and the deputy director … [and was] responsible for development and presentation of information … to a certain extent." (*Id.* at 37, #246).

As more fully discussed below, this dispute regarding the scope of Colorez's job duties potentially matters to this Motion, in that Colorez is claiming retaliatory discharge in violation of his First Amendment rights. The First Amendment offers

---

[1] Pin citations are to the corresponding PageID number.

substantially less protection for job-related speech by a public employee (which this Opinion calls "employee-speech") than for non-job-related speech by that same employee (referred to here as "citizen-speech"). Accordingly, the narrower the scope of Colorez's job, the more likely that the speech at issue falls into the latter category, and thus the more likely it can serve as the basis for a First Amendment retaliation claim.

## B. Colorez Raises Concerns About City Practices.

During his short tenure with the City, Colorez expressed several concerns about various City practices. He believes that these comments, whether individually or cumulatively, provided the impetus for his termination. His concerns related to the City's: (1) recycling program; (2) procurement system; (3) greenspace mowing; (4) street sweeping; and (5) abandoned lot abatement. (Compl., ¶ 12–21, Doc. 1, #6-8). Given the First Amendment framework that applies, due consideration is warranted as to the relationship, if any, between each issue and Colorez's job. To ascertain that, this Court must first explore more fully the nature of each of the listed concerns and the manner in which Colorez raised them.

Colorez was concerned with how the City conducted its metal recycling program. (Colorez Dep. at 96, #305). Namely, he believed the City should be receiving money for its metal recyclables rather than paying a vendor to haul away and recycle metal waste. (*Id*. at 95, #304). Colorez raised this issue during a meeting he had with Sue Magness, who Colorez recalled as the City's "Director of Environmental Services." (*Id*. at 95–96, #304–05). When Magness told him to look into the issue and

call her back, Colorez inquired to Chris Callahan (a fellow employee), and then pressed the matter further with Smith, his supervisor two steps up. (*Id.* at 96–97, #305–06). He and Smith discussed the recycling program "within that week, [or a] couple days [of him learning about the issue] … but it had to be maybe late July, early August somewhere in there." (*Id.* at 97–98, #306–07). Their discussion occurred "in the hallway" of the "Public Services Hopple Street building." (*Id.* at 98, #307).

Colorez also took issue with the City's procurement methods, specifically the use of BFX, LLC ("BFX"). (Colorez Dep. at 62–64, #271–73). BFX provided the City with products that Colorez and his team used in connection with their work for the City. (*Id.* at 55–56, #264–65). The BFX program was a pilot program, attempting to centralize and streamline City purchasing and third-party facilities services. (Black Dep. Ex. 6, Doc. 18-6, #133–59). Colorez thought that the prices BFX charged the City were exorbitant; he believed procurement through other means, including his employees being able to purchase materials directly, would save money for both his department and the City. (Colorez Dep. at 75–77, #284–86). Specifically, he raised concerns about how much the City was paying for paper towels (Compl. at ¶ 21, #7–8), paint, (Colorez Dep. at 64–65, #273–74), garbage can liners, (*id.* at 54–56, #263–64), other "inferior goods," (*id.* at 50–51, #259–60), and service fees to pressure wash a garage (*id.* at 76, #285).

Colorez asserts that he took these concerns directly to Smith, (*id.* at 56–57, 77, #265–66, 286), but it appears from the record he only raised them with her orally, as no one has pointed to any written documentation reflecting these concerns. Colorez

could not remember exactly when his conversation with Smith occurred, but he thought it was roughly "during the time when [he] was speaking with [Smith] about all [his] concerns, the three or four occasions [they] had together." (*Id.* at 77, #286). These conversations, some of which also included Koopman, occurred at the Hopple Street Building, during both a staff meeting and in one-off conversations. (*Id.* at 57–58, #266–67).

Colorez was also troubled by the quality and payment structure for contracted greenspace mowers, a system he believed promoted waste. (*See id.* at 83, #292). These contractors were responsible for mowing and maintaining particular City greenspaces, including parks, which fell under Colorez's supervision. (*Id.* at 14, 83–88, #223, 292–97). As Colorez understood it, part of his job was to ensure that grass on City property was cut in an efficient and cost-effective manner; he believed the contractors were working in opposition to this goal. (*Id.* at 16, #225). Based on concerns workers in his department raised, Colorez investigated this issue and discovered that the contract mowers were not completing work, but were submitting invoices, which the City often paid without investigation. (*Id.* at 88–89, #297–98). As citizen complaints about overgrown grass accumulated, Colorez instructed John Erwin (a City employee) to cross-reference those complaints with the lots assigned to the contract mowers. (*Id.* at 88–89, #297–98). Discovering overlap, Colorez took this issue to Smith. (*Id.* at 84–85, #293–94).

Colorez similarly questioned the efficiency of contracted street sweepers who cleaned City streets. (*Id.* at 53, #262). Colorez claimed he knew the street sweepers

were not performing their duties because he lived downtown. (*Id.*). He confirmed his suspicions when he reviewed the sweepers' contract, which he requested via email from Robert Armacost (a City employee). (*Id.* at 78–79, #287–88). Colorez then reviewed GPS tracking data (or lack thereof) that was "supposed to be attached with the [streetsweeper] invoices." (*Id.* at 80, 82, #289, 291). Sensing inefficiency, coupled with a lack of corroborating GPS data, Colorez concluded his employees could do a better job. (*Id.* at 79–80, #288–89). He discussed this idea with Smith, to whom he suggested that "if the City would sweep [the streets at issue], that we would save a huge amount of money and it would get done on a nightly basis." (*Id.* at 51, 53–54, 83, #260, 262–63, 292). After being rebuffed, he voiced this same concern during a staff meeting. (*Id.* at 79–80, #288–89).

Finally, Colorez took issue with various costs the City incurred for abandoned lot abatement. (*Id.* at 89–91, #298–300). After analyzing the before and after photos of a typical abatement project, Colorez determined the small amount of work completed "did not justify the … exorbitant cost." (*Id.* at 92, #301). Then, after reviewing the bills sent to the City from the private contractors, Colorez compared them to what he believed it would cost for his employees to do the same work and he concluded the latter would be more efficient. (*Id.* at 93–94, #302–03). He again went to Smith. (*Id.* at 91, #300).

## C.    Colorez's Employment Ends and He Sues the City.

In the end, Colorez's tenure with the City lasted approximately ten weeks; Smith terminated his employment on September 8, 2017. (Black Dep. Ex. 3, Doc. 18-3,

#116). Colorez believes his inquiries about recycling, procurement, mowing, street sweeping, and lot abatement were the impetus for his discharge.

Based on this belief, on November 3, 2017, Colorez filed his Complaint asserting five claims, all predicated on different theories of liability, but all related to his tenure with the City. These claims included wrongful termination in violation of Ohio public policy (Count One); violation of Ohio's whistleblower protection laws (Count Two); abuse of power as to Black and Smith (Count Three); and two § 1983 claims: one for retaliatorily discharge in violation of the First Amendment (Count Four), and the other asserting the City Defendants violated his substantive Due Process rights under the Fourteenth Amendment (Count Five). (Compl. at ¶¶ 25–50, #8–11).

After answering, the City Defendants moved for judgment on the pleadings as to all five claims. (Doc. 10). On August 3, 2018, Judge Black, who was then assigned to the case, issued an Order granting the motion in part. (Doc. 14). Specifically, Judge Black granted the City Defendants' motion as to Counts One, Two, Three and Five, but denied the motion as to Count Four, the First Amendment allegation, because the Complaint did not clearly indicate whether Colorez's speech was made pursuant to his official duties. (*Id.* at #86–87). With discovery now complete, Defendants ask this Court to revisit this remaining question.

## PENDING MOTION

In their Motion for Summary Judgment (Doc. 21), the City Defendants argue Colorez's claim fails as a matter of law, either on the merits or on qualified immunity

grounds. On the merits, they contend that there is no genuine dispute that Colorez's speech was employee-speech, and thus his termination, whether in retaliation for that speech or not, cannot form the basis for a First Amendment claim. Alternatively, they argue that, even if a constitutional violation occurred, under *Monell* there can be no municipal liability for the City, and that Black and Smith are individually entitled to qualified immunity.

## DISCUSSION

### A.    Standard of Review on Summary Judgment.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347.

This Court does not have the responsibility to *sua sponte* search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). If the nonmoving party fails to make the necessary showing for an element upon which it

has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). In sum, Colorez, at this stage, must present some "sufficient disagreement" which would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the non-moving party, here Colorez. *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The sole remaining claim—retaliatory termination in violation of the First and Fourteenth Amendments—arises under 42 U.S.C. § 1983. This poses two separate yet related issues for summary judgment, each requiring its own analysis. First, "[t]o state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

Second, this Court must address the question of qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, "'[i]n determining whether the government officials in this case are entitled to qualified immunity, [this Court] ask[s] two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538–39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). This Opinion addresses the constitutional question first: determining whether the public employee speech at issue here is entitled to First Amendment protection.

## B.     Colorez's First Amendment Claim Fails as a Matter of Law.

The First Amendment "guarantees freedom of expression" and prohibits Congress, and by incorporation state actors, from restricting "the rights of individuals to speak freely." U.S. CONST. amend. I; *see Gitlow v. People of State of N.Y.*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment). The First Amendment protects speech rights of a public employee. As relevant here, a public employer cannot retaliate against an employee based on the employee's exercise of his or her First Amendment rights. If a person acting under color of state law violates this

prohibition, that gives rise to a cause of action under § 1983. *See Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985).

Here, Colorez asserts claims against Black and Smith in both their individual and official capacities. The latter claims, however, are treated as claims against their employer, the City of Cincinnati. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (noting official capacity § 1983 claims are claims against the official's office). Thus, the official-capacity claims against the two merge into the claim against the City. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690, n.55 (1978) ("[O]fficial capacity suits … represent only another way of pleading an action against an entity of which an officer is an agent."); *Everson v. Leis*, 556 F.3d 484, 493 n.3 (6th Cir. 2009) (collecting cases). Accordingly, this Court starts with the individual-capacity claims against Black and Smith, and then turns to the claim against the City.

1.    ***Not all public employee-speech has First Amendment protection; rather, such protection is reserved for citizen-capacity speech.***

To prevail on his First Amendment retaliation claim against Black and Smith for terminating his employment, Colorez must prove "(1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action." *Haddad v. Gregg*, 910 F.2d 237, 243 (6th Cir. 2018) (citation omitted). Colorez maintains he engaged in "constitutionally protected" speech, and that this speech was the motivating factor for his termination. But because the speech

at issue occurred in the context of Colorez's public employment, the First Amendment analysis is somewhat different.

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). While a public employee does not shed their First Amendment rights merely because of their government employment, the First Amendment's protection is not as robust as it is in other contexts. In particular, public employee speech receives First Amendment protection only when the employee "speak[s] as a citizen addressing matters of public concern." *Id.* at 417 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)). In adopting this limitation, the Court sought to accommodate the inherent tension between affording public employees adequate First Amendment protection without constitutionalizing every employee grievance. *See id.* at 420.

This Court's resolution of the pending motion requires a three-step inquiry under *Garcetti*. The first question is whether the speech at issue was made pursuant to Colorez's official duties. *Garcetti*, 547 U.S. at 417. Speech "pursuant to the employee's official duties" (i.e., "employee-speech") is unprotected. *Garcetti*, 547 U.S. at 413. But for speech outside that realm, where the public employee is speaking as a citizen (i.e., "citizen-speech"), the second step asks whether the speech touches on a matter of public concern. *Id.* (citations omitted). If Colorez's speech here was *either* (1) employee-speech *or* (2) citizen-speech that did not involve a matter of public concern, his First Amendment claim fails as a matter of law. If, however, Colorez can

satisfy both inquiries, the third step requires balancing Colorez's First Amendment right with the City's need to promote "the efficiency of the public services it performs through its employees." *Id.* at 417 (quotation and citation omitted).

Moreover, in making the pursuant-to inquiry, this Court is also mindful that *Garcetti* is not the Supreme Court's last word on the employee-speech/citizen-speech dichotomy. More recently, in *Lane v. Franks*, 573 U.S. 228, 240 (2014), the Supreme Court modified *Garcetti's* "official duties" language by adding the term "ordinary." That is, under *Lane*, to take advantage of the "official duties" exception to First Amendment protection (i.e., to show that the speech is employee-speech outside the protection of the First Amendment), the public employer must show the speech related to the employee's "ordinary job responsibilities." *Id.* And the Sixth Circuit, in an even more recent decision, concluded that the Supreme Court's intent in adding the word "ordinary" was to avoid transforming broad swaths of speech by employees into unprotected employee-speech "simply because it concern[ed] … the speaker's public employment." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463 (6th Cir. 2017). Keeping in mind *Garcetti*'s tripartite analytic framework, as clarified by *Lane*, the Court now turns to whether the speech at issue here can give rise to a First Amendment claim.

## 2. *Whether public employee-speech is protected is a legal question, determined by a multi-factor balancing test.*

The initial trick in a public-employee First Amendment retaliatory discharge case is determining whether the speech at issue constitutes "citizen-speech." As the Sixth Circuit observed, "[d]etermining whether an employee speaks as a private

citizen or as a public employee can be challenging," but the "inquiry is a practical one." *Mayhew*, 856 F.3d at 464 (quotation omitted).

As the Court is facing this issue in the context of a motion for summary judgment, a threshold consideration is whether the "pursuant-to inquiry" (i.e., whether Colorez's speech was made pursuant to his "official duties") constitutes a question of law or a question of fact. If the latter, there is a greater likelihood that jury involvement would be warranted to resolve the issue. The Sixth Circuit has confirmed though, that, notwithstanding some cases from other Circuits suggesting otherwise, the pursuant-to inquiry is a legal question that this Court must resolve. *See Mayhew*, 856 F.3d at 462–64 (quoting *Connick v. Myers*, 461 U.S. 138, 148, n.7 (1983)) ("In sum, the district court did not err by concluding that the determination as to whether Mayhew engaged in protected speech was one of law."); *see also Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010) (noting cases from other circuits, but dismissing them as "irrelevant" on this point).

Actually *answering* that legal question, however, remains a difficult task. Despite *Garcetti*, *Lane*, and a substantial body of precedent, there is still no "comprehensive framework for defining the scope of an employee's duties." *Mayhew*, 856 F.3d at 464. Rather, as noted above, courts are to make a "practical" inquiry. *See id.* (quoting *Garcetti*, 547 U.S. at 424). To assist in that endeavor, the Sixth Circuit has identified several "factors to consider" including: (1) the impetus for the speech; (2) the setting of the speech; (3) the speech's audience; and (4) the general subject

matter.[2] *See Aquilina v. Wrigglesworth*, 759 F. App'x 340, 344 (6th Cir. 2018) (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540–41 (6th Cir. 2007)). In other words, the court asks "who, where, what, when, why, and how." *Mayhew*, 856 F.3d at 464 (collecting cases).

As is often the case with open-ended, multi-factor balancing tests, the guidance the *Weisbarth* factors offer can be under-determinative in a given case. While the factors are clearly stated, the weight and consideration afforded each, and the manner of resolving conflicts among them, is more ambiguous. That being said, one recurring theme in Sixth Circuit case law appears to be that employee-speech made solely "up the chain of command" will not support a First Amendment claim. *See Mayhew*, 856 F.3d at 466 ("When a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of his job."); *Keeling v. Coffee Cty.*, 541 F. App'x 522, 527 (6th Cir. 2013) (holding the speech was not protected because "[m]ost importantly, her speech pertained to her employment … and was made up the chain of command."); *Fox*, 605 F.3d at 350 (holding a teacher's complaints made directly to her supervisor about class size were not protected); *Burgess v. Paducha Area Transit Auth.*, 387 F. App'x 538, 545 (6th Cir. 2010) (holding communications made at the workplace and directed

---

[2] These factors are sometimes referred to as the "*Handy-Clay*" factors. *See Henderson v. City of Flint*, 751 F. App'x 618, 623–24 (6th Cir. 2018) ("The *Handy-Clay* factors weigh in favor of concluding that [the employee's] report to [the insurer] occurred in her official capacity."); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012). But recently, the Sixth Circuit has also referred to these factors as the "*Weisbarth*" factors. *Aquilina*, 759 F. App'x 340, 344 (6th Cir. 2018) (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540–41 (6th Cir. 2007)). It is a distinction without a difference; the latter nomenclature is used here.

to management were not protected); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) ("The fact that Haynes communicated solely to his superior also indicates he was speaking 'in his capacity as a public employee'"). The Sixth Circuit has never expressly adopted that position, though, so whether that factor in and of itself is dispositive is an open question.

### 3. *Applying the Sixth Circuit's test, Colorez's speech constituted employee-speech pursuant to his ordinary job responsibilities.*

With the Sixth Circuit's guidance in hand, the Court now turns to the speech at issue here. To start, the Court notes that, if the "chain of command" factor is dispositive, that presents problems for Colorez, as he points to nothing in the record suggesting he voiced any of the concerns he raised here to anyone *but* his supervisors or other City employees. And even if it is not dispositive, a trek through the four *Weisbarth* factors and the Sixth Circuit's precedent regarding each, while perhaps making it a slightly closer call, ultimately leads to the same destination: Colorez's speech is unprotected.

Colorez alleges several instances of speech that he says give rise to protection. More specifically, he cites to concerns he expressed about street sweeping, abandoned lot abatement, contracted greenspace mowers, metals recycling, and procurement. This Court addresses each of these in turn.

At oral argument, Colorez conceded, and rightly so, that his concerns as to the first three topics—street sweeping, abandoned lot abatement, and greenspace mowing—directly related to matters that were part of his ordinary job duties as the NOD Superintendent. On these, *Garcetti* is dispositive, even without reference to

*Weisbarth*: "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes[.]" *Garcetti*, 547 U.S. at 421. Thus, Colorez's speech on those topics cannot support his First Amendment retaliation claim. Separately, even were that not the case, Colorez made his comments on these topics "up the chain of command," which, as noted, strongly suggests (and arguably even compels) a finding that those incidences of speech are not protected. *See, e.g., Mayhew*, 856 F.3d at 466.

Finally, putting that aside and applying the *Weisbarth* factors, even in the manner most favorable to Colorez, likewise compels the conclusion that his allegedly-protected speech on these three topics was actually made pursuant to his ordinary job duties. In particular, the impetus for the speech was to make the department he managed more efficient; the setting of the speech was at work; the speech's audience was his supervisors or the employees who reported to him; and the general subject matter related to his job responsibilities. *See Weisbarth*, 499 F.3d at 540–41. There is simply no way to conclude otherwise on the facts here. Thus, for any or all of those reasons, Colorez's speech on those three topics does not support a § 1983 retaliatory termination case.

The remaining two categories of speech on which Colorez relies—his complaints about the metal recycling program and BFX procurement—require a closer look at the *Weisbarth* factors, but the end result is the same. Admittedly, the first factor—the impetus for the speech—is perhaps equivocal. As to both of these programs, Colorez argued that the changes he was proposing could save the City

money—for example, on the BFX issue, he testified that he had reported to his supervisors that direct purchasing could be "a big cost savings to taxpayers." (Colorez Dep. at 65, #274). On one hand, an interest in saving the City money certainly seems consistent with Colorez's job responsibilities of assisting the City to operate in an efficient manner, but it is also perhaps consistent, as Colorez argues now, of concerns he has as a taxpayer about the City's profligate spending. Thus, this factor is perhaps a draw.

The next two *Weisbarth* factors, though, cut strongly in favor of characterizing his comments here as employee-speech. As for the speech's setting, Colorez made all his comments on both of these topics while at work; nothing in the record suggests otherwise. The audience for Colorez's comments included Sue Magness, Chris Callahan, and Smith, all of whom were either City employees or Colorez's direct or indirect superiors. Moreover, unlike *Aquilina* (discussed below), Colorez did not have some "ultimate [public] audience" in mind. His comments were not made with the thought, or even the hope, that the person to whom he spoke would inform the public. And despite now arguing that he had concerns about "corruption" regarding the BFX purchasing issue, he did not to speak to a reporter, did not write a "Dear Editor" letter to the Cincinnati Enquirer, and did not publicly raise his concerns at a city council meeting.[3] There are countless ways Colorez *could* have chosen to speak out, protected by the First Amendment, but he opted for none of them. These factors weigh strongly

---

[3] The Court does not provide these as examples of actions that would necessarily afford First Amendment protection, but rather as examples that may have changed the analysis under the *Weisbarth* factors.

in favor of finding that his workplace comments constituted employee-speech, rather than speech entitled to First Amendment protection.

Fourth and finally, subject matter: This is again a closer call, but again tips in favor of characterizing the speech here as employee-speech. On the BFX procurement front, there is no dispute that, as the NOD Superintendent, Colorez necessarily oversaw, instructed, or was involved with procurement in connection with his ordinary or *de facto* job duties. (*See, e.g.*, Colorez Dep. at 50–51, 54–56, 64–65, 75–77, #259–60, 263–64, 273–74, 284–86). Indeed, the principal concerns Colorez expressed about BFX procurement related to the allegedly exorbitant prices being charged for products used *in his department*. That strikes this Court as necessarily job related. Metal recycling, on the other hand, was neither part of Colorez's "official duties," nor his *de facto* job responsibilities as NOD Superintendent. But trash collection *was* among his official duties and recycling is at least somewhat *related* to that issue.

Given all of the facts here, a holistic application of the four *Weisbarth* factors ineluctably leads to the conclusion that Colorez's comments on recycling, as well as his comments on the BFX procurement matter, constitute speech pursuant to his official capacity as a public employee, not speech as a private citizen. In reaching this result, the Court is mindful that one concern about multi-factor balancing tests is that they can often serve as a type of judicial Rorschach test. That is especially true in close cases, but this is not such a case. Considering the undisputed facts, the speech here firmly falls on the employee-speech side of the *Garcetti* divide, and therefore does not give rise to First Amendment protection.

A review of Sixth Circuit First-Amendment-retaliatory-discharge case law further confirms this result. In *Holbrook v. Dumas*, 658 F. App'x 280, 281–83 (6th Cir. 2016), for example, the court concluded a fire chief's speech, which consisted of an email to his firefighters, was unprotected because the email primarily addressed the department's potential closure and firefighter job cuts. Affirming summary judgment in the employer's favor, the court found Holbrook "communicated … with fire department employees in furtherance of his responsibilities as Fire Chief." *Id.* at 288. In reaching that result, the court noted Holbrook signed the email as "Fire Chief," sent the email from his official account, addressed it to fire department employees, and the content was an employment matter. *Id.* The who, what, when, where, why, and how all indicated "Holbrook communicated pursuant to his official duties," and "his speech was therefore not protected." *Id.* at 289. The district court's weighing of the *Weisbarth* factors supported this conclusion. *Id.* at 288. What seemed to particularly drive the court's decision was that the speech ultimately "owe[d] its existence to a public employee's professional responsibilities." *Id.* at 288 (quotation omitted). Given that fact, Holbrook's claims that he communicated "as a concerned friend or citizen" did not fly. *Id.* at 289. Just so here. Colorez's complaints "owed their existence" to his professional responsibilities and thus constituted employee-speech.

Moreover, *Holbrook* is just one example of many cases applying the *Weisbarth* factors that ultimately hold speech unprotected when it occurs at work and is related, even if sometimes loosely, to the employee's job. *See, e.g.*, *Henderson v. City of Flint*, 751 F. App'x 618, 622 (6th Cir. 2018) (denying protection to a city administrator

because reporting financial mismanagement to the city's chief legal officer "bore all the markers of official action"); *Mayhew*, 856 F.3d at 464–66 (denying protection to a wastewater treatment lab supervisor because the speech that he asserted was protected was actually within his ordinary job duties); *Housey v. Macomb Cty.*, 534 F. App'x 316, 317–19 (6th Cir. 2013) (denying protection to a court official who was terminated after reporting misconduct, but whose speech was not protected because "ensuring compliance with established [employer] polices" was "part of what he, as a probate court register, was employed to do") (quotation and citation omitted); *Fox*, 605 F.3d at 348 (denying protection to a teacher who directed comments to a supervisor, not the general public); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (denying protection to a police officer tasked with training police dogs who spoke out about the potential effects of reduced K-9 training). All of these cases recognize the importance of courts respecting the distinction between employee-speech and citizen-speech, lest courts end up constitutionalizing the employee grievance process, thereby interfering with public employers' ability to manage their workplaces. *Garcetti*, 547 U.S. at 420.

To be sure, there are also cases in which the pursuant-to analysis comes out the other way. But typically that is so only if there is some specific fact that the employee identifies that serves to cleanly divorce the speech at issue in the particular case from the public employee's workplace duties. In *Aquilina v. Wrigglesworth*, 759 F. App'x 340, 346 (6th Cir. 2018), for example, the Sixth Circuit found that a judge was engaged in citizen-speech when she permitted a reporter to view a video, largely

*because* the reporter's involvement implied an eventual public audience for the video materials. Similarly, in *Boulton v. Swanson*, 795 F.3d 526, 533 (6th Cir. 2015), the Sixth Circuit held that speech by a public employee about departmental training was citizen-speech, but largely because the speech occurred while the employee was engaged in labor arbitration and participating in that arbitration as a union leader, not acting in his typical employee capacity. Finally, in *Westmorland v. Sutherland*, 662 F.3d 714, 719–20 (6th Cir. 2011), the Sixth Circuit held a fire-rescue diver's speech protected because it occurred while he was off-duty, out-of-uniform, and at a public city council meeting, despite the speech being about policies within his department. In each of these cases, there was some factor that delineated a clear breaking point between the employee's job and the speech at issue.

Here, there is no such clear delineation. This means that Colorez's speech is decidedly more like the speech at issue in *Weisbarth*, *Mayhew*, *Holbrook*, *Haynes*, or *Fox* than it is to the speech in *Aquilina*, *Boulton*, or *Sutherland*. Unlike the latter cases, Colorez has not identified any specific factor clearly divorcing his speech from his job duties. Accordingly, Colorez has not raised a genuine dispute of material fact as to *Garcetti*'s first prong. It is unnecessary, therefore, to determine whether his speech involved a matter of public concern,[4] or to engage in the employee/employer

---

[4] The framework for deciding whether speech relates to a matter of public concern is "not well defined" either. *Snyder v. Phelps*, 562 U.S. 443, 452 (quoting *San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam)). There are, however, guideposts: "Speech involves matters of public concern when it can be fairly considered as relating to [1] any matter of political, social, or other concern to the community, or [2] when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2016) (quoting *Phelps*, 562 U.S. at 453). Separately, Sixth Circuit case law suggests that in addition to falling within one of these two categories, there is another aspect to the public-concern inquiry. In particular, speech regarding alleged "breach[es] of public trust" or allegations of corruption are more often than not a "matter of

balancing test.[5] As a result, there is no constitutional violation, meaning that Black and Smith are entitled to summary judgment on the individual-capacity claims against them.

## C.   *Monell* **Liability and Qualified Immunity.**

With the claims against the individual defendants gone, two issues remain, but they merit only quick discussion. The first is Colorez's claim against the City (and his official-capacity claims against Smith and Black, which, as noted above, are one and the same with his claim against the City). It is well settled that there is no *respondeat superior* liability under § 1983. *Monell*, 436 U.S. at 691. To be sure, a political subdivision, here the City, is a "person" under § 1983, and can be liable under that statute, but only if a plaintiff "show[s] that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted). That means in turn that, while municipalities may be sued directly, a threshold for liability under *Monell* is that a

---

public concern." *See Handy-Clay*, 695 F.3d at 543 (quotation omitted) (citing *Connick v. Myers*, 461 U.S. 138, 148 (1983)); *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988) ("This Court has held that speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection."). *Cf., e.g., Handy-Clay*, 695 F.3d at 543 ("We have noted that the mere fact that public monies and government efficiency are related to the subject of a public employee's speech does not, by itself, qualify that speech as being addressed to a matter of public concern."). Regardless, this case does not require this Court to reach that issue.

[5] The Supreme Court announced the standard for this balancing test in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1986). It "requires a court to balance the interests of the public employee 'as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Handy-Clay*, 695 F.3d at 544 (quoting *id.* at 568). This shifts the burden to the employer, who must "proffer legitimate grounds for the allegedly retaliatory action at issue." *Id.* (citing *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008)). This Court need not reach this issue either.

"federal right violation occurred."[6] *Id.* For the reasons discussed above, the Court finds that Black and Smith have not individually violated Colorez's constitutional rights; Colorez has not alleged anyone else did either. Given that, the City cannot be liable. *Monell*, 436 U.S. at 691.

Separately, apart from the merits of the constitutional claim, there is the question of whether Black and Smith are entitled to qualified immunity. That is, in order to prevail on a § 1983 claim, not only must Colorez identify a constitutional violation, but he must also show the violation was of a "clearly established" right. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). As *Saucier* made clear, though, a court is free to consider the question of whether a right is clearly established either before or after it determines whether a violation occurred at all. *Id.* Here, this Court elected to address the latter question first—whether any constitutional violation occurred. As the undisputed facts show that no such violation occurred, any further discussion of qualified immunity is unnecessary, and thus unwarranted. *See BellSouth Telecomm., Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008) ("'If it is not necessary to decide more, it is necessary not to decide more.'") (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)).

---

[6] Whether the governmental actor who actually committed the constitutional violation must be named as a defendant in the action that seeks to impose municipal liability is a separate question. *See Anderson v. Jones*, No. 1:17-cv-327, slip op. at 20–23 (S.D. Ohio Feb. 19, 2020) (Cole, J.) (discussing Sixth Circuit caselaw on this issue). Here it does not matter though, as Colorez has not suggested some other City employee, whom he did not name as a defendant in this action, violated his constitutional rights.

## CONCLUSION

For the reasons above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 21) and **DISMISSES WITH PREJUDICE** the remaining claim against the City Defendants. The Court **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

February 26, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**